**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHARON ANN CHANEY | ) | CASE NO. 1:22-cv-01291-CEH |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| v. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| Defendant, | | |

## I.      Introduction

Plaintiff, ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB"). This matter is before the Court by consent of the parties under 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (ECF No. 7). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding.

## II.      Procedural History

Claimant filed applications for POD and DIB on March 13, 2017, alleging a disability onset date of January 26, 2017. (ECF No. 8, PageID #: 885). The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On September 12, 2018, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (*Id.*). The ALJ issued a written decision finding Claimant was not disabled on December 27, 2018. (*Id.*). The ALJ's decision became final on March 22, 2019 when the Appeals Council declined further review. (*Id.*).

1

Claimant then filed a complaint in the U.S. District Court for the Northern District of Ohio,
challenging the Commissioner's final decision. On October 25, 2019, the Court remanded the case
pursuant to a joint stipulation and directed the Appeals Council to instruct the ALJ to "reweigh the
opinions of record" and to "offer the claimant a new hearing, take further action to complete the
administrative record resolving the specified issues, and issue a new decision." (*Id.* at PageID
#: 1029). Upon remand, the Appeals Council instructed the ALJ to give further consideration to:

- whether the claimant's fibromyalgia was a medically
  determinable impairment in accordance with Social Security
  Ruling 12-2p.

- the nature, severity, and limiting effects resulting from the
  claimant's headache impairment.

- the treating source opinion pursuant to the provisions of 20 CFR
  404.1527 and the third-party statements pursuant to 20 CFR
  404.927, and explain the weight given to such opinion evidence.

- the claimant's maximum residual functional capacity and
  provide appropriate rationale with specific references to
  evidence of record in support of the assessed limitations (20
  CFR 404.1545 and Social Security Ruling 96-8p).

(*Id.* at PageID #: 1037–38). The Appeals Council also instructed the ALJ to "obtain supplemental
evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's
occupational base" if the expanded record warranted it. (*Id.*).

The ALJ then held a second administrative hearing on June 17, 2020 where Claimant, who
was represented by counsel, and a vocational expert testified. (*Id.* at PageID #: 886). On August
27, 2020, the ALJ issued an unfavorable decision. (*Id.* at PageID #: 882). On appeal, the Appeals
Council declined to assume jurisdiction on May 25, 2022. (*Id.* at PageID #: 872).

Claimant then filed another complaint in federal court on July 21, 2022, challenging the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 11, 13, 15). Claimant asserts the following assignment of error:

> (1) The ALJ's RFC is contrary to law because it fails to adequately evaluate the medical opinion evidence of record and because she failed to properly evaluate Plaintiff's pain-related limitations pursuant to SSA policy

(ECF No. 11, PageID #: 1338).

### III.    Background

### A.  Relevant Hearing Testimony

The ALJ summarized the relevant allegations and testimony from Claimant's hearing:

> In written statements, the claimant alleged disability due to PMR, giant cell arteritis, anxiety and fast heart beat (Exhibit 4E). The claimant reported that the decrease of the steroid Prednisone has brought on recurrence of pain, weakness and fatigue (Exhibit 9E). Her muscles are feeling achy (like a toothache). She has throbbing pain in her lower legs and her arms have pain and weakness. She is unable to lift her arms over her head without pain for 5 seconds and she feels a burning sensation. She feels foggy and unclear. Her headaches are returning with tightness at the base of her neck and her whole head is painful (like a flaring fan). These headaches are more intense and her blood pressure is more elevated. The claimant reported increased headaches, pain, frequency and duration (Exhibit 10E). She has daily occipital pain, increased blood pressure and muscle weakness. She is a chronic steroid user and she has worsening pain when the steroids are decreased. She reported no difference when prescribed migraine medication. She has loss of sleep due to discomfort. Her activities of daily living have lessened due to pain, muscle spasms, malaise, and generally feeling ill. She is unable to participate in recreational activities. She has little interest or pleasure in doing things. She has muscle stiffness especially in the morning and evening. She has color changes of the hand and feet in the cold. She has sun sensitive rashes. She reported she could no longer due housekeeping tasks due to increased pain and muscle weakness, increased muscle spasms, increased dizziness, loss of balance, fogginess, confusion and loss of sleep. She suffers from numbness and tingling in the arms, hands and feet. She is too tired to visit with family or to go outside. Her driving has

3

decreased due to feeling weak and dizzy. She spends most the time laying down. She is unable to lift and she has difficulty with stairs. Many of her medications that she requires cause her to be tired, drowsy, sluggish, and loss of concentration. She has unintentional slow weight loss. She has pain in her shoulders and down her arms. There is sciatic discomfort in the lower right extremities.

At the June 17, 2020 hearing, the claimant testified she lives with her husband, daughter and two grandchildren. She testified she has not worked in the last three years. She testified she could not work because her health has gotten worse and her quality of life has declined. She testified she gets headaches going up the back of her head and it is due to the deterioration of her cervical spine. She testified her C5-C6 and C6-C7 have deteriorated which causes headaches. She testified she takes medications for her headaches and it helps and she also takes Tramadol for pain. She testified she has to lay down for about two hours before the headache goes away. She testified she was in the hospital in December because she had a headache that lasted for five days and it made her blood pressure go sky high. She testified she has pain and loss of motion in her arms. She testified she has deterioration of the joints of the right shoulder. She testified she had right shoulder surgery in October 2019. She testified that she has a bone spur in the left shoulder. She testified she has had a steroid injection. She testified her shoulder pain limits her range of motion. She testified she has pain from her shoulder all the way down to the wrist and it prevents her from vacuuming and lifting anything heavy. She testified she has constant pain and decreased range of motion in both arms. She testified that her hands have become weaker. She testified that when she stands at the sink her back gets weak and goes into spasms. She testified she could stand 15-20 minutes. She testified she has weakness in both of her legs. She testified she has nausea and diarrhea from her irritable bowel syndrome. She testified she has constant fatigue and she sometimes takes three hour naps. She testified she has fogginess in her head and she has problems with concentration. She testified she has problems focusing. She testified that side effects from medications include not feeling herself. She testified her social life is non-existent because of physical discomfort. She testified she is not able to sit, stand or walk for long periods due to discomfort. She testified she has anxiety and depression. She testified she did not see a mental health counselor. She testified she has headaches daily and they usually last for two hours. She testified that when her brother was in hospice she would visit him for about an hour. She testified she watched TV. She testified she is always hurting and she was always in pain. She testified she does small grocery shopping for milk and bread. She testified she makes a few dishes like eggs or

> pasta. She testified she loads the dishwasher and she makes her bed. She testified that when she has a headache it feels like her whole head is going to blow off her shoulders. She testified she could not reach overhead or look up because of pain in her neck. She testified when she walks she has cramping in her right hip. She testified she could walk 15-20 before she has hip pain.

(ECF No. 8, PageID #: 893–94).

### B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

> The record shows the claimant presented in September 2016 with complaints of pain. She worked at Docere Medical Spa, was negative for frequent or significant headaches, had no changes in hearing or vision, and had no nosebleeds. She had chronic nonintractable headache, unspecified type and was prescribed hydrocodone (Exhibit 3F, page 23). The record from September 2017 showed the claimant presented with complaints of posterior neck and occipital region headaches. However, both a computed tomography (CT) (June 9, 2017) and a magnetic resonance imaging (MRI) of the brain (July 1, 2017) were unremarkable. The notes showed a longstanding history of intermittent headaches, worsening after a concussion in 2015 (Exhibit 13F, page 2). Evidence from June 2018 revealed that, while she endorsed pain and intractable headaches, the headaches were not on a daily basis. The examination was positive for frequent or significant headaches, but there were no changes in hearing or vision, no nosebleeds, and an MRI and CT showed no etiology (Exhibit 14F, pages 10-12).

> The claimant presented to Susan P. Mathai, M.D., a treating doctor, on January 26, 2017. Dr. Mathai reported the claimant noted she woke in September 2016 with bilateral arm pain for three months. Her Cymbalta was increased and she was evaluated by rheumatology (Dr. Al Haddad) who ran tests that were all normal. She noted an unintentional weight loss the past two years, described arm pain and endorsed fatigue. However, she denied fevers, night sweats, and she had "no red hot swollen joints." The notes showed she worked two days a week as an aesthetician so used her hands a lot, had no regular exercise, and took care of her grandchildren who lived with her (Exhibit 1F, page 4). Dr. Mathai's examination revealed all joints with full range of motion, mild pain on palpation of bilateral upper arms, good strength of all extremities, and no active synovitis. Dr. Mathai diagnosed the claimant with myalgia, malaise and fatigue, and weight loss (Exhibit 1F, pages 2-10).

The claimant presented to Angela Murphy, DO., a treating doctor, on February 2, 2017, for a prescription refill. Dr. Mathai had recently diagnosed the claimant with PMR with prednisone prescribed. Dr. Murphy diagnosed the claimant with chronic nonintractable headaches. The examination showed clear lungs and normal examination of the extremities with no clubbing, cyanosis, or edema. Her generalized pain had slightly improved (prescription for one month) and Topamax had significantly improved her headaches. Dr. Murphy noted that, as the PMR improved on Prednisone; she would be weaned off Norco (Exhibit 2F, pages 113-114). Due to right leg pain in May 2016, the claimant underwent bilateral hip x-rays that showed symmetric and preserved joint spaces of the hips, transitional vertebrae at the lumbosacral junction, and tiny calcifications adjacent to the right acetabulum that might represent labral calcifications or os acetabuli. No acute fracture was identified (Exhibit 3F, page 71).

The claimant phoned Dr. Mathai on March 16, 2017. Dr. Mathai noted that, if the claimant was doing well on ten milligrams prednisone, she should taper to nine milligrams every other day for one month, then taper lower. If her pain resurfaced, Dr. Mathai instructed she should call, but the goal was to taper down by one milligram per month (Exhibit 3F, page 6). Dr. Mathai evaluated the claimant on April 13, 2017 for follow-up of her PMR (Exhibit 9F, p. 58). Since her last visit, she complained of pain in her bilateral upper arms and mild chronic headaches that come and go. Examination noted the lungs were clear to auscultation. She had a regular heart rate and rhythm. There was no significant edema or varicosities in the lower extremities. She was alert and focused. She had good recall of recent and remote events. Cranial nerves were grossly intact. Muscle strength and muscle tone seemed normal. There was no decreased muscle mass. She had a normal gait and station. All joints were examined and were normal without pain, tenderness, swelling, deformity/subluxation, and with full range of motion. She was diagnosed with PMR, malaise and fatigue.

On June 9, 2017, the claimant presented to the emergency room with a complaint of headache and nausea (Exhibit 9F, p. 84). The headache was sudden onset. She reported that the pain was severe and unlike her previous migrainous headaches in the past. She reported some mild nausea, but no vomiting. Examination noted no meningeal signs. There was no temporal pain or jaw claudication. Nonfocal neurological examination. CT of the head and CTA of the head and neck were unremarkable and showed no evidence of hemorrhage or aneurysms. Differential diagnosis includes, but is not

limited to, tension headaches versus migraine versus subarachnoid hemorrhage.

The claimant presented to Manuel A. Martinez, M.D., an examining doctor, on June 13, 2017 with complaints of cervical pain. Dr. Martinez stated the claimant reported right sided moderate pain rated five out of ten, but not radiating. The examination showed the claimant was able to climb onto the exam table with no difficulty, had normal gait, had normal biomechanics with history taking, and had symmetrical range of motion bilateral cervical spine without any difficulty. Her motor function was +5/+5 bilateral upper and lower extremities, she had full range of motion of the bilateral shoulders, and she had a negative roll test of the bilateral hips. Cervical spine x-rays showed some straightening of the normal lordosis and degenerative changes at the C5-6 and C6-7, with loss of joint space and spurring noted. The final diagnosis was cervical spondylosis with possible radiculopathy versus peripheral nerve entrapment of the upper extremities (Exhibit 4F, pages 5-6).

Peter Bambakidis, M.D., evaluated the claimant on June 30, 2017 for follow-up of chronic intractable headache (Exhibit 9F, p. 127). The headache peaked within a matter of a few minutes beginning in the cervical region bilaterally and/or perhaps at the base of the skill from which area it generalized. Examination noted she was awake, alert, cooperative and coherent. Motor strength was normal. There is no tendon reflex asymmetry or Babinski response. In summary, there are features of the headache that remind me of the well known Thunderclap headache now with intractable chronic daily headache. Interestingly there are none of the typically associated features encountered with the migraine.

Jennifer S. Kriegler, M.D., evaluated the claimant on August 21, 2017 for her complaint of headaches (Exhibit 9F, p. 157). Examination was unremarkable other than brisk reflexes and physiologic left mouth droop. She had a daily headaches concerning for spontaneous cerebrospinal fluid (CSF) leak which has essentially resolved.

Sean K. Battisti, M.D., evaluated the claimant on September 26, 2017 (Exhibit 13F). The claimant has an extensive past medical history which includes fibromyalgia, PMF, hypertension, chronic headaches, coronary artery disease, generalized anxiety disorder and irritable bowel syndrome. The claimant continues to complain of posterior neck and occipital region headaches. She has a longstanding history of intermittent headaches, which worsened after a concussion in 2015 for which she was started on Topiramate.

The headaches abruptly worsened with a thunderclap of posterior right head pain which was preceded by Valsalva on June 6, 2017. The claimant had some improvement after Gabapentin was started. Examination noted she was in no acute distress. The lungs were clear to auscultation with no wheezing, rhonchi or rales. She had a regular heart rate and rhythm without murmur, gallop or rub. Examination of the extremities was normal. There was no clubbing, cyanosis or edema in the extremities. She was assessed with generalized headaches.

MRI of the cervical spine on December 28, 2017 demonstrated moderate right neural foraminal narrowing at C5-6 (Exhibit 14F). Mild left neural foraminal narrowing at C6-7. No central spinal stenosis or significant disc herniations.

Duret S. Smith, M.D., evaluated the claimant on June 5, 2018, for her complaint of left thumb pain (Exhibit 14F, p. 16). She reported moderate pain. The thumb pain is aggravated by activity, excessive use and picking up small objects. She reported associated pain and stabbing pain. She has difficulty with fine manipulation. Examination noted she was alert and oriented and in no acute distress. She had tenderness in the CMC joint on the right more so than the left more so than the right. She was tender in the area. She has laxity of other ligaments in the hand. No gross neurovascular deficits noted to either upper extremity. No significant swelling in the CMC joint on either side. X-ray of the left hand showed very minimal CMC degenerative joint disease. No acute changes. The impression was ligamentous laxity and CMC degenerative joint disease with pain. She was assessed with unilateral primary osteoarthritis of first carpometacarpal joint, right and left hand and polymyositis.

On June 20, 2018, Dr. Mathai, a treating doctor (rheumatology), noted the claimant demonstrated a normal gait and station. Dr. Mathai examined all joints and they "were normal without pain, tenderness, swelling, deformity, deformity/subluxation, and with full range of motion except…modest tender points noted, pain in bilateral CMC joints, no acute synovitis, and no red hot swollen joints" (Exhibit 14F, page 13). Dr. Mathai further reported that, while the claimant's clinical history was classical for PMR, her labs were negative for inflammatory markers, "but her symptoms and physical compatible with diagnosis of PMR." Dr. Mathai noted the claimant had an x-ray of the cervical spine that showed mild arthritis and no reason for headaches. The claimant conceded that the Neurontin had helped a little with neck pain and headaches and she took two to three Tylenols a day. Dr. Mathai recommended the

claimant get optimal sleep, graded regular aerobic exercise (stationary bike, pool therapy), and optimal treatment of depression. The claimant was to consider a sleep study and have a healthy diet and she was return in about six months (Exhibit 14F, pages 10-15).

Dr. Battisti evaluated the claimant on June 26, 2018 for follow-up on myalgia (Exhibit 21F). The claimant has a history of chronic generalized myalgia throughout her body (hands, hips, shoulders, neck, etc.) as well as recurrent headaches. It was noted that Dr. Matai suspects the claimant has a mixture of PMR and fibromyalgia because her symptoms are consistent with the diagnosis of PMR, although she has not tested positive for inflammatory markers. She has been on steroids in the past with good response. She has tried numerous medications to control her pain with little to no improvement of symptoms. Examination noted she was alert, cooperative, pleasant and in no acute distress. She had a regular heart rate and rhythm without murmurs. The lungs were clear to auscultation without rales or wheezes. She was tender to palpation at 12 trigger points. Her gait was normal. She was assessed with fibromyalgia, PMR, hypertension (good control), and coronary artery disease involving native heart without angina pectoris (hemodynamically stable).

Mehrun K. Elyaderani, M.D., evaluated the claimant on July 23, 2018 for her left thumb pain (Exhibit 18F). The claimant has PMR. She has had steroids chronically for some time and she has recently tapered off. Examination noted she had pain over the thumb in the webspace and then laterally. She did not have any pain over the MCP joint specifically. No tenderness over the FPL. She had no triggering. She had no CMC related pain. She had the ability to flex and extend the fingers. Inventory of the flexor and extensor tendons was intact. The impression was thumb muscular rheumatological type pain.

CT of the neck on October 19, 2018 showed elongated styloid process on the right that extends from the origin inferiorly to just above the level of the hyoid bone (Exhibit 22F). Degenerative change right temporomandibular joint. Degenerative disc and endplate change C5-C6 and C6-C7 levels. No evidence of a cervical mass.

Dr. Battisti evaluated the claimant on January 25, 2019 (Exhibit 21F, p. 21). The claimant continues to complaint of chronic generalized myalgia. She reported concern of chronic right lower back pain, which she described as achy. The back pain travel to her right hip. She complained of right arm pain along the proximal

aspect of her triceps muscle. X-rays of her right shoulder and humerus on November 30, 2018 were unremarkable. Musculoskeletal examination noted tenderness to palpation along the distal portion of the arm. Full range of motion of right shoulder, right elbow and right wrists. She was assessed with fibromyalgia, arm pain, posterior, right, right hip pain and tachycardia.

Dr. Martinez evaluated the claimant on March 22, 2019 for her complaint of right shoulder pain (Exhibit 24F). The shoulder pain does not radiate. Lifting, pulling, pushing, raising arms overhead and reaching aggravate her shoulder pain. Heat, ice and Ibuprofen provide minimal relief. She has difficulty with dressing, fastening opening behind the neck, fastening bra, pulling clothes on over the head, pushing and pulling, or reaching. Left shoulder inspection was normal. There was no atrophy, crepitation or swelling of the right shoulder. There was no tenderness of the left shoulder. There was tenderness of the right humeral shaft, subacromion and mild tenderness of the right shoulder, but no tenderness of the right bicipital groove, long head of bicep or trapezius. Muscles strength was 5/5 throughout. Left shoulder had full range of motion. Right shoulder adduction had discomfort with pain. Apprehension test is negative with pain in the right. Drop arm test was negative bilaterally. Hawkins-Kennedy impingement test was positive in the right. Impingement sign was negative bilaterally. Popeye biceps sign was negative bilaterally. She was alert and oriented x3. Her mood was normal. Sensation was grossly intact to light touch. There was pain to the palpation of the proximal third of the humerus in the posterior aspect. No pain to resistive flexion or extension of the elbow. There was no pain over the biceps region. Neurological and vascular status are grossly intact in the right upper extremity. There is +2/+2 radial pulse. There was no pain with range of motion of the cervical spine. Right shoulder and right humerus x-ray did not show any fracture or dislocations. Minimal degenerative joint disease at the AC joint is noted. The impression was rotator cuff disease of the right shoulder, possible tear, and questionable etiology of pain in the proximal humerus. She was assessed with sprain of right rotator cuff capsule, and pain in right upper arm.

MRI of the right shoulder on March 28, 2019 noted acromioclavicular osteoarthritis (Exhibit 23F, p. 10). Bone marrow edema within the acromion and distal clavicle at the acromioclavicular joint as well as joint periscapular edema suggesting low-grade acromioclavicular joint injury. Bursal surface fraying of the distal anterior fibers of supraspinatus tendon. Tiny superior labral tear involving the biceps anchor. MRI of the right humerus showed no acute or aggressive abnormality of the humerus.

Dr. Martinez evaluated the claimant on April 2, 2019 for follow-up of MRI of the shoulder (Exhibit 24F, p. 4). Examination noted she can abduct to approximately 100 degrees with pain beyond that and flexion zero to 100 with pain beyond that. Internal rotation zero to 90. Neurological and vascular status were grossly intact in the upper extremities. MRI noted rotator cuff disease along with degenerative joint disease of the right AC joint along with a possible small labral tear. Steroid injection and physical therapy but claimant declined.

On July 12, 2019, the claimant underwent a right shoulder Xylocaine injection (Exhibit 24F, p. 8).

Dr. Battisti evaluated the claimant on September 13, 2019 for her complaint of back pain (Exhibit 22F, p. 3). The claimant had presented to the emergency room on August 26, 2019 with a complaint of right sided low back pain that gradually worsened over the last week. She tired heat, Aleve, and tramadol with minimal improvement. Evaluation noted sacroiliac joint tenderness. She was discharged in stable condition. Currently, the claimant reported her back pain had resolved, but it has now returned. She complained of pain along the sacrum and sacroiliac joint. The pain is variable with movement and it can be aching or stabbing. Back examination noted full range of motion. There was no tenderness to palpation along paraspinal muscles or spinal processes. There was no step-off lesion. Straight leg raise was negative. She had bilateral sacroiliac joint tenderness. There was no edema in the lower extremities. She was assessed with acute bilateral low back pain without sciatica and fibromyalgia.

Irwin M. Mandel, M.D., evaluated the claimant on September 19, 2019 for her complaint of right shoulder pain (Exhibit 24F, p. 10). Her pain is mild to severe depending on her activity level. She has pain along the right side of her shoulder which radiates down her arm. The claimant reported that the steroid injection did provide some relief. The pain is aggravated by reaching. The impression was right partial vs. full thickness rotator cuff tear, superior labral repair, impingement bursitis of the shoulder.

It was noted that the claimant underwent right rotor cuff repair and labral repair on October 9, 2019 (Exhibit 24F, p. 23). The claimant reported she had been improving and her pain was moderate. On December 26, 2019, the claimant reported mild pain. She reported increased pain at night. The pain was located on the right side and proximally and radiates down to the wrist. She reported increased pain with physical therapy. The claimant reported on February 6,

11

2020 that she had moderate pain at the site of the pathology and the pain was still significant. She reported some aching pain. She was discharged form physical therapy because she had failed to shop up. Examination noted her range of motion was 170/60/170. She had abduction to 90 degrees. Supraspinatus, infraspinatus and external rotation strength was 5/5. She has no pain with Neer and Hawkins maneuvers. Neurovascular examination was intact. The impression was status post right arthroscopic shoulder surgery, decompression and debridement.

The claimant presented to the emergency room with a complaint of a headache on December 5, 2019 (Exhibit 23F, p. 16). She reported that over the last few days she noted constant severe left-sided headache. Examination noted she was alert, oriented and in no apparent distress. Neurological examination noted motor strength was +5/5 throughout. Sensation to sharp touch was intact bilaterally. She had a normal mood and affect. Shoulder shrug was symmetric. She was able to ambulate without difficulty. There were no focal neurological deficits. There was no neck pain or stiffness. CT and CTA of the head showed no acute process. Intracranial hemorrhage was unlikely. Clinical impression was headache.

Dr. Battisti evaluated the claimant on April 23, 2020 for bilateral arm pain and loss of range of motion (Exhibit 19F). She complained of acute on chronic bilateral upper extremity pain for two months. She described constant pain from her bilateral shoulders to wrists, but no pain along bilateral hands or fingers. She described aching muscle soreness. She mentioned decreased range of motion with flexion and extension of arms secondary to pain. She had difficulty lifting light objects due to pain. Musculoskeletal examination noted myalgia along the bilateral upper extremities. There was no new joint swelling or erythema. She was assessed with fibromyalgia.

(*Id.* at PageID #: 895–900).

## C. Opinion Evidence at Issue

Opinions from Dr. Sean Battisti, M.D., and Ms. Michele Albert, P.T., are at issue on appeal. The ALJ summarized Dr. Battisti's opinions in their decision:

Dr. Battisti completed a Physical Medical Source Statement on August 9, 2018 (Exhibit 17F). The claimant was diagnosed with fibromyalgia, PMR, hypertension, chronic headaches, coronary artery disease, generalized anxiety disorder and irritable bowel syndrome. Dr. Battisti opined that the claimant did not require a job

12

> that permits shifting at will. Her legs did not require elevation; she could occasionally lift and/or carry 10 pounds and never 20 pounds; and she could occasionally twist, stoop, crouch, and squat. Dr. Battisti opined the claimant would be "off task" 25 percent or more of a typical workday.
>
> Dr. Battisti noted that the claimant has fibromyalgia and/or assumed PMR (Exhibit 20F). Her symptoms tend to be more subjective, than objective

(*Id.* at PageID #: 902). The ALJ also discussed Ms. Albert's functional capacity evaluation:

> Michele Albert, Physical Therapist, performed a functional capacity examination on August 6, 2018 (Exhibit 16F). The evaluation did not demonstrate the ability to meet the physical demand requirements of an LPN. The claimant demonstrated the ability to function in the sedentary physical demand category. She demonstrated the ability to occasionally lift up to 15 pounds floor to waist, 15 pounds waist to shoulder, carry up to N/A pounds, push N/A pounds of force, and pull N/A pounds of force. She completed a single stage treadmill test at 2.0 mph and 5% grade. This was sufficient to predict the claimant's functional aerobic capacity at 2.89 METS for an 8 hour time period. Deficits identified during testing included decreased upper and lower extremity strength, decreased standing tolerance, decreased overhead reach, decreased ability to reach floor level, decreased stooping ability and decreased crouching ability.

(*Id.* at PageID #: 901).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.
>
> 2. The claimant has not engaged in substantial gainful activity since January 26, 2017, the alleged onset date (20 CFR 404.1571 et seq.).
>
> 3. The claimant has the following severe impairments: spine disorders, dysfunction of major joints, headache, osteopenia, fibromyalgia and polymyalgia rheumatica (PMR) (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except: She can occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds. She can stand or walk for 6 hours of an 8-hour workday. She can sit for 6 hours of an 8-hour workday. She can frequently climb ramps and stairs. She can occasionally climb ladders, ropes or scaffolds. She can frequently stoop, kneel and crouch. She can occasionally crawl. She can have frequent exposure to extreme cold and vibration.

6. The claimant is capable of performing past relevant work as a licensed practical nurse. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 26, 2017, through the date of this decision (20 CFR 404.1520(f)).

(*Id.* at PageID #: 888–905).

## V.  Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

14

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (en banc)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B. Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to DIB: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

**C. Discussion**

15

Claimant raises one assignment of error on appeal. She challenges the ALJ's RFC, alleging it fails to account for the opinion evidence and her subjective allegations of pain. (ECF No. 11, PageID #: 1338). However, with this "single" assignment of error, Claimant raises up to five different claims the Court will address below.

## 1. Opinion Evidence

Claimant argues the ALJ failed to adequately evaluate the opinions of Dr. Battisti and Ms. Albert and erred in giving them little weight. (*See id.* at PageID #: 1347, 1350). In her brief, she claims the ALJ did not give "good/specific/supported" reasons for rejecting the opinions. (*Id.*).

Under the treating source rule,[1] an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting § 404.1527(d)(2) (eff. to July 31, 2006))). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

> If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician.

---

[1] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* § 416.927. However, Plaintiff filed her claim before the revision took effect.

*Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* § 404.1527(c)(2). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188 at \*5). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

### a. Dr. Battisti

Claimant specifically attacks the ALJ's rationale for rejecting Dr. Battisti's opinions, claiming they incorrectly asserted there was no basis for his off-task restriction and that their description of the opinions' inconsistencies is "misleading." (ECF No. 11, PageID #: 1353). Additionally, she argues that the ALJ improperly substituted their lay opinion when they found that Dr. Battisti's opinions were inconsistent with his treating notes. (*Id.* at PageID #: 1354).

The Commissioner counters that the ALJ provided adequate rationale for rejecting the opinions by discussing their unsupportability and inconsistency, as well as providing good reasons for affording them little weight. (ECF No. 13, PageID #: 1385–86). One "good reason" the Commissioner discusses is the opinions' reliance on Claimant's subjective complaints, which the

ALJ found only partially consistent with the record. (*Id.* (citing *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 257–58 (6th Cir. 2016) ("Here, the ALJ rejected the 2009 report's finding that Martin was unable to work because the opinion drew from Martin's subjective complaints of symptoms rather than objective medical evidence. This constitutes a proper reason for denying controlling-weight status . . . ."))). The Commissioner finally notes that the ALJ afforded other contradictory opinions great weight and discussed these findings immediately after analyzing Dr. Battisti's opinions. (*Id.*).[2]

The ALJ summarized Dr. Battisti's opinions before affording them weight:

> Dr. Battisti completed a Physical Medical Source Statement on August 9, 2018 (Exhibit 17F). The claimant was diagnosed with fibromyalgia, PMR, hypertension, chronic headaches, coronary artery disease, generalized anxiety disorder and irritable bowel syndrome. Dr. Battisti opined that the claimant did not require a job that permits shifting at will. Her legs did not require elevation; she could occasionally lift and/or carry 10 pounds and never 20 pounds; and she could occasionally twist, stoop, crouch, and squat. Dr. Battisti opined the claimant would be "off task" 25 percent or more of a typical workday.
>
> Dr. Battisti noted that the claimant has fibromyalgia and/or assumed PMR (Exhibit 20F). Her symptoms tend to be more subjective, than objective.

(ECF No. 8, PageID #: 902). As Dr. Battisti was a treating source,[3] he was entitled to controlling

---

[2] The Court notes that Claimant makes a passing argument that both Dr. Battisti's and Ms. Albert's opinions should have been considered together since they supported for each other's conclusions. (ECF No. 11, PageID #: 1351). However, the ALJ is under no obligation to determine how the opinions compare to each other, and simply because one opinion might support another opinion does not warrant remand. *See Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.") (citations omitted).

[3] While Claimant concedes that the ALJ acknowledged that Dr. Battisti was a treating source, she argues they "gave no obvious consideration to the fact that treating sources are generally preferred by the Agency and entitled to more weight." (ECF No. 11, PageID #: 1351).

weight unless the ALJ found his opinions to be unsupported by the medical record or inconsistent with substantial evidence in the case record. *See* § 1527(c)(2). Here, the ALJ found the opinions inconsistent with the totality of the evidence and unsupported. (ECF No. 8, PageID #: 902). They afforded the opinions "little weight" for the following reasons:

> they are not consistent with the totality of the evidence (Exhibits 17F and 20F). MRI of the cervical spine that revealed moderate right neural foraminal narrowing at C5-6 and mild left neural foraminal narrowing at C6-7, but no central spinal stenosis or significant disc herniations (Exhibit 16F, pages 1 and 3). Examinations noted a normal gait and station, normal joints without pain, tenderness, swelling, deformity, deformity/subluxation, and with full range of motion except: modest tender point, pain in bilateral CMC joints, no acute synovitis, and no red hot swollen joints (Exhibit 14F, page 13). CT and brain MRI in June and July 2017 were unremarkable. The examination was negative for joint pain or swelling, back pain, or muscle pain, she had normal extremities, and had no clubbing, cyanosis or edema. Furthermore, there is no evidence to support the conclusion that the claimant would be off-task 25% of the workday. There are no mental health records in the file and a consultative examiner found only mild to no mental symptoms (Exhibit 6F). The limitations appears to be based on the claimant's subjective complaints rather than objective testing.

(*Id.*).

The ALJ first noted the opinions were inconsistent with the medical evidence and unsupported by the record. While Dr. Battisti recommended Claimant could only occasionally lift or carry ten pounds and never lift or carry twenty pounds, the ALJ found that this was inconsistent with MRI and examination results. (*Id.*). They noted that Claimant's cervical spine MRI revealed only moderate right neural foraminal narrowing at C5-6, mild left neural foraminal narrowing at

However, she fails to cite any rule requiring ALJs to explicitly reference the treating source rule in reviewing treating source opinions. As there is no such rule, the ALJ did not err in failing to explicitly reference § 404.1527. Moreover, as the above text demonstrates, the ALJ complied with the treating source rule by discussing the supportability and consistency of the opinions, as well as providing good reasons for affording them little weight.

C6-7, and no central spinal stenosis or significant disc herniations. (*Id.*). Upon review of the examination records, the ALJ found that Claimant demonstrated "normal" gait and station and "normal" joints without pain, tenderness, swelling, deformity, or subluxation. (*Id.*). They observed that aside from modest tender points and pain in bilateral CMC joints, he had a full range of motion without acute synovitis or "red hot swollen joints." (*Id.* (citing Ex. 14F)). Further, they observed Claimant's CT and brain MRI in June and July 2017 were unremarkable. (*Id.*). As far as supportability, the ALJ noted that Dr. Battisti's examination was negative for joint pain and swelling, back pain, or muscle pain and that she had "normal" extremities, without clubbing, cyanosis, or edema. (*Id.*). These metrics do not support Dr. Battisti's physical lifting and carrying restrictions, which would have precluded medium work. Additionally, the ALJ found that the doctor's twenty-five percent off-task restriction was not supported by anything in the record, specifically noting an absence of mental health records and another expert's finding that Claimant had "mild to no" mental symptoms. (*Id.* (citing Ex. 6F)). Although Claimant assumes that the off-task restriction is supported by Dr. Battisti's note that Claimant experienced regular pain, there is no evidence that the limitation was recommended to accommodate pain. (ECF No. 11, PageID #: 1353). Even assuming it was, there is no evidence supporting the doctor's twenty-five percent recommendation, opposed to other percentages. As the ALJ properly explained why Dr. Battisti's recommendations were inconsistent with and unsupported by the record, substantial evidence supports their decision to withhold controlling weight. [4]

The ALJ also provided "good reason" for giving the opinions little weight. They noted that

---

[4] The Court also rejects Claimant's argument that the ALJ improperly asserted their own lay opinion in analyzing inconsistencies between Dr. Battisti's notes and opinions. (*See* ECF No. 11, PageID #: 1354). The ALJ is entitled to review the consistency of opinions with the medical record as a whole. § 404.1527(c)(4). Thus, an ALJ is perfectly entitled to compare such records for inconsistencies, and the ALJ here did not substitute their lay opinion for Dr. Battisti's.

Dr. Battisti's limitations appeared to be based on Claimant's subjective allegations for symptoms rather than objective testing. (ECF No. 8, PageID #: 902). As discussed below, the ALJ discounted these allegations later in their opinion, and this constitutes "good reason" for affording little weight, as the Commissioner argues. *See Martin*, 658 F. App'x at 257–58 (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given [controlling] deference when supported by objective medical evidence.")). Additionally, the ALJ's subsequent endorsement of competing expert opinions—that recommended medium work—also demonstrates why the ALJ afforded Dr. Battisti's opinions little weight. *See Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470–71 (6th Cir. 2006) (finding the ALJ implicitly "met the goal of § 1527(d)(2)" in discussing other—conflicting—opinion evidence in the record). Accordingly, substantial evidence supports the ALJ's decision to withhold controlling weight from the opinions, and the Court will not disturb the findings.

### b. Ms. Albert

Claimant also challenges the ALJ's treatment of Ms. Albert's opinion, arguing her functional capacity evaluation ("FCE") is objective medical evidence the ALJ improperly rejected in favor of their own lay opinion. (ECF No. 11, PageID #: 1354–56). She argues the FCE results were raw medical data the ALJ should not have interpreted and that the report "cannot be reasonably described as anything other than *objective* evidence." (*Id.*). If the ALJ had been reasonable, Claimant argues they could have instead sent the FCE results to the consultants to review. (*Id.*).

The Commissioner argues the ALJ followed the legal standard and identified substantial evidence to assign little weight to Ms. Albert's opinion. (ECF No. 13, PageID #: 1386). Although

Claimant contends the ALJ "played doctor" by evaluating raw data, the Commissioner contends Claimant erroneously confuses data with objective medical evidence and that the ALJ properly evaluated the opinion against evidence in the record. (*Id.* at PageID #: 1388–89).

The ALJ summarized Ms. Albert's opinion:

> Michele Albert, Physical Therapist, performed a functional capacity examination on August 6, 2018 (Exhibit 16F). The evaluation did not demonstrate the ability to meet the physical demand requirements of an LPN. The claimant demonstrated the ability to function in the sedentary physical demand category. She demonstrated the ability to occasionally lift up to 15 pounds floor to waist, 15 pounds waist to shoulder, carry up to N/A pounds, push N/A pounds of force, and pull N/A pounds of force. She completed a single stage treadmill test at 2.0 mph and 5% grade. This was sufficient to predict the claimant's functional aerobic capacity at 2.89 METS for an 8 hour time period. Deficits identified during testing included decreased upper and lower extremity strength, decreased standing tolerance, decreased overhead reach, decreased ability to reach floor level, decreased stooping ability and decreased crouching ability.

(ECF No. 8, PageID #: 901). The ALJ then gave the opinion "little weight" for the following reasons:

> I assigned little weight to this opinion because it is not internally consistent with the totality of the evidence or the claimant's activities of daily living. Ms. Albert did not comment or take into account the reliability of the testing or consistent of the claimant's efforts during testing. The record supports the claimant's complaints of pain and weakness from her conditions; however, examinations noted full strength, normal range of motion, tender points and a positive straight leg raise, these findings do not support the less than sedentary residual functional capacity. The claimant reported she could cook, take medications, grocery shop, drive, get along with others, spend time with others, live with others, manage funds, watch TV and handle self-care and personal hygiene.

(*Id.*).

As an initial matter, the Court is not convinced Ms. Albert is a treating source whose opinion is entitled to controlling weight. A treating source is someone who "has, or has had, an

ongoing treatment relationship" with the claimant. *See Cole*, 661 F.3d at 938 (citing § 404.1502). Here, there is no evidence Ms. Albert saw or examined Claimant before or after completing the FCE in August 2018. The Court cannot find any reference to other appointments with Ms. Albert in the medical record, ALJ's decision, or either parties' recitation of the medical and opinion evidence. (*See* ECF No. 11, PageID #: 1340–45; ECF No. 13, PageID #: 1368–73). This leads the Court to conclude that Ms. Albert was not a treating source subject to controlling deference.

Either way, the ALJ complied with the spirit of § 404.1527, which permits ALJs to withhold controlling weight if an opinion is inconsistent with and unsupported by the record, instead assigning another weight for "good reason." Here, the ALJ found the opinion was inconsistent with and unsupported by the medical record and Claimant's daily activities which included cooking, taking medications, grocery shopping, driving, managing funds, watching television, and handling self-care and hygiene. (ECF No. 8, PageID #: 901–02). While the medical record revealed Claimant's complaints of pain and weakness, the ALJ noted it also highlighted full strength and normal range of motion which were inconsistent with Ms. Albert's sedentary recommendations. (*Id.*). Additionally, the ALJ discounted the opinion because Ms. Albert did not consider "the reliability of the testing or consisten[cy] of the claimant's efforts during testing," a good reason for assigning little weight. (*Id.*). Substantial evidence therefore supports the ALJ's decision to give this opinion little weight.

The Court also notes that part of Ms. Albert's opinion was an improper disability finding. She wrote, "[t]he results of this evaluation indicate that [Claimant] did not demonstrate the ability to meet the physical demand requirements of a LPN." (*Id.* at PageID #: 855). This is a disability finding reserved for the Commissioner. *See* § 404.1527(d)(1); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (explaining that even treating sources cannot offer proper disability findings).

Therefore, the ALJ was right in withholding controlling or great weight from this opinion.

Moreover, the ALJ did not improperly review "raw medical data" as Claimant argues. The ALJ instead summarized Ms. Albert's findings, including several functional limitations the expert recommended for adoption in the RFC. (*See* ECF No. 8, PageID #: 901). These included a sedentary work capacity recommendation and other functional limitations such as occasionally lifting up to fifteen pounds floor to waist and fifteen pounds from waist to shoulder. (*Id.*). The ALJ was entitled to review such limitations and did not improperly assert their "lay opinion" in doing so.[5] *See* § 416.945(a)(1). Moreover, courts in this district have defined "interpreting raw medical data" as drawing medical conclusions, such as diagnoses, or creating functional limitations from data, not evaluating the credibility of an opinion. *See Gonzalez v. Comm'r of Soc. Sec.*, 3:21-cv-000093-CEH, 2022 WL 824145, at *8 (N.D. Ohio Mar. 18, 2022) (citing *Alexander v. Kijakazi*, No. 1:20-cv-01549, 2021 WL 4459700, at *9 (N.D. Ohio Sept. 29, 2021) ("Courts are generally unqualified to interpret raw medical data and make medical judgments concerning limitations that may reasonably be expected to accompany such data."); *Mascaro v. Colvin*, No. 1:16CV0436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016) (noting neither the ALJ nor the court had the medical expertise to conclude whether the results of a neurological exam necessarily ruled out the existence of a disabling condition)). As the ALJ did not draw medical conclusions from the opinion—but simply assigned it "little weight"—they did not err in their evaluation.

Substantial evidence supports the ALJ's decision to give Ms. Albert's opinion little weight. Accordingly, the Court will not disturb the ALJ's finding.

---

[5] The Court also rejects Claimant's cursory argument that the FCE was "objective" medical evidence the ALJ failed to accept. (ECF No. 11, PageID #: 1354–55). In assigning Ms. Albert's opinion little weight, the ALJ did not categorically reject the FCE findings, but rather, Ms. Albert's recommended limitations based on the data.

### 2.  Fibromyalgia

Claimant next challenges the ALJ's consideration of her fibromyalgia and related symptoms. (ECF No. 11, PageID #: 1356). SSR 12-2p establishes special rules for how ALJs evaluate whether fibromyalgia is a severe impairment at Step Two. SSR 12-2p, 2012 WL 3104869, at *3. The ruling also provides guidance about how to evaluate a claimant's fibromyalgia at later steps in the disability evaluation process. *Id*. at *4–6.  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence" and typically should be reversed. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 729 (6th Cir. 2014) (quoting *Cole*, 661 F.3d at 939–40).

Here, the ALJ clearly listed Claimant's fibromyalgia as a severe impairment at Step Two, and Claimant has not alleged any error with that analysis. (*See* ECF No. 8, PageID #: 889). The Court is left to determine whether there is a reversible issue related to the ALJ's evaluation of Claimant's disability in the later steps of the process. Claimant states that the ALJ failed "to properly evaluate Plaintiff's [fibromyalgia or] the full extent of her [fibromyalgia]-related limitations, by placing inappropriate emphasis on her normal muscle strength and range of motion." (ECF No. 11, PageID #: 1359). Additionally, Claimant asserts that the ALJ "never followed the analysis required by SSR 12-2p/§ 404.1529(c)/SSR 16-3p." (*Id.* at PageID #: 1358). The Commissioner argues that the ALJ reviewed all the relevant evidence in support of their determination and that they did not err in failing to explicitly reference SSR 12-2p because their analysis was consistent with the ruling. (ECF No. 13, PageID #: 1382–83 (citing *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 834 (6th Cir. 2006) ("Because the ALJ conducted the analysis required by the Ruling, his failure to mention it by name is not fatal to the decision."))).

As noted above, the ALJ found that Claimant suffered from fibromyalgia and designated it as a "severe" impairment. A finding that fibromyalgia constitutes a severe impairment, however,

does not equate to a finding of disability, nor does a diagnosis of fibromyalgia corroborate the severity of a claimant's pain symptoms. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) ("A diagnosis of fibromyalgia does not automatically entitle [claimant] Vance to disability benefits; particularly so here, where there is substantial evidence to support the ALJ's determination that [claimant]'s fibromyalgia was either improving, or, at worst, stable."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority."); *accord Foutty v. Comm'r of Soc. Sec.*, No. 5:10 CV 551, 2011 WL 2532915, at *7 (N.D. Ohio June 2, 2011) (Knepp, M.J.), *report and recommendation adopted*, 2011 WL 2532397 (N.D. Ohio June 24, 2011).

SSR 12-2p sets forth the necessary requirements for a fibromyalgia finding and also explains that ALJs must evaluate a person's statements about their symptoms and functional limitations by using the two-step method set forth in the regulations and in SSR 96-7p.[6] First, the ALJ must determine whether "medical signs and findings that show the person has [a medically determinable impairment(s)] which could reasonably be expected to produce the pain or other symptoms alleged," recognizing that fibromyalgia "satisfies the first step of our two-step process for evaluating symptoms." SSR 12-2p, 2012 WL 3104869 at *5. Second, SSR 12-2p specifically allows the ALJ to consider whether "objective medical evidence . . . substantiate[s] the person's statements about the intensity, persistence, and functionally limiting effects of symptoms." *Id.* If not, the ALJ is to consider "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and

---

[6] The Court notes that SSR 16-3p superseded SSR 96-7p on March 28, 2016.

26

statements by other people about the person's symptoms." *Id.*

The Court agrees with the Commissioner that the ALJ evaluated the medical and opinion evidence regarding Claimant's fibromyalgia and related symptoms. As discussed above, the ALJ recognized that Claimant suffered from fibromyalgia when they identified it as a severe impairment. (*See* ECF No. 8, PageID #: 889). Then throughout their RFC analysis, the ALJ referenced records that discussed the condition and repeatedly noted Claimant's alleged fibromyalgia-related symptoms. (*See id.* at PageID #: 895 (citing Ex. 1F), 897 (Exs. 13F, 21F), 898 (citing Ex. 21F), 899 (citing Ex. 22F), 900 (citing Ex. 19F)). They noted that Claimant reported myalgia, pain, malaise, headaches, and fatigue to providers from January 2017 to January 2019. (*Id.* at PageID #: 895, 897, 898). Reviewing Claimant's pain medications, the ALJ noted that she used Norco, Prednisone, Neurontin, Tylenol, and Ibuprofen for pain. (*Id.*). They also observed that Claimant alleged that lifting, pulling, pushing, and raising her arms aggravated pain but that heat, ice, and Ibuprofen provided relief. (*Id.*). Finally, the ALJ reviewed statements from Claimant's employer and husband about her condition, as well as her daily activities. (*See id.* at PageID #: 894 (referencing Claimant's husband's testimony), 900–01 (employer's statement)).

After reviewing these factors, the ALJ rejected the severity of Claimant's allegations of symptoms, including pain:

> The claimant's allegations are partially consistent with respect to the nature of her symptoms. However, her allegations that her symptoms are so severe that she cannot perform work at substantial gainful activity levels are not consistent in light of the evidence of record and activities consistent with the ability to perform a range of work. The claimant alleged disability due to PMR, giant cell arteries, anxiety and fast heart beat. Although I found the claimant to have severe impairments, they are not work preclusive. Evidence of record regarding the claimant's daily activities is consistent with a residual functional capacity for work. The claimant can prepare meals, take medications, shop, drive, get along with others, spend time with family, live with others, watch TV, manage funds, and

> handle self-care and personal hygiene. However, to the extent that
> she is self-limited, this does not in itself establish a medical or
> pathological basis for such restrictions, nor is the record consistent
> with her alleging an incapacity for all sustained work activity. There
> is no evidence that the claimant's use of prescribed medication is
> accompanied by side effects that would interfere significantly with
> her ability to perform work within the restrictions outlined in this
> decision. No treating source refers to the claimant as having
> incapacitating or debilitating symptoms that would prevent her from
> returning to her past relevant work or other work, or has otherwise
> described the claimant as "totally and permanently disabled" by her
> impairments and complaints. In summary, the evidence does not
> corroborate the claimant's allegations of symptoms attributed to her
> impairments to an extent that would preclude the performance of
> work with the restrictions stated above.

(*Id.* at PageID #: 903).

In rejecting Claimant's allegations of disabling symptoms, the ALJ reviewed numerous
SSR 16-3p factors. First, they noted that Claimant's allegations were not consistent with her daily
activities, which included preparing meals, taking medications, shopping, driving, and handling
self-care and personal hygiene. (*Id.*). The ALJ then discussed Claimant's medications and found
that they did not cause any side effects that "interfere significantly" with her ability to perform
work. (*Id.*). Referencing the treating source opinions, they found that even these experts—who
recommended strict limitations—did not acknowledge any "incapacitating or debilitating
symptoms" that would preclude work. (*Id.*). The ALJ concluded that the evidence did not support
Claimant's allegations. (*Id.*).

The ALJ also reviewed SSR 16-3p factors in other parts of their opinion. They noted the
various locations Claimant experiences pain, including her neck, shoulder, head, upper extremities,
thumb, "right side[]" of her body, and lower back. (*Id.* at PageID #: 896 (citing Exs. 4F, 9F), 897
(citing Exs. 14F, 21F), 898 (citing Exs. 18F, 21F, 24F)). Reviewing treatment records from June
2018 and March 2019, the ALJ found that "activity, excessive use and picking up small objects"

exacerbated thumb pain and that lifting, pulling, pushing, raising arms overhead, and reaching aggravated shoulder pain, as mentioned above. (*Id.* at PageID #: 897, 898). Finally, the ALJ noted that Claimant has received at least one Xylocaine injection for pain and referenced several trips to the emergency room to treat headaches. (*Id.* at PageID #: 896, 899, 900).

Finally, the Court rejects Claimant's argument that the ALJ failed to consider her past work experience, which was required as a factor under § 404.1529(c)(3) and SSRs 96-8p and 16-3p. (ECF No. 11, PageID #: 1261–62). As Claimant concedes, past work history does not entitle her to enhanced credibility. (*Id.* at PageID #: 1362). Instead, past work experience is a *factor*, rather than a required element for consideration. (*Id.*). The ALJ therefore did not err in failing to explicitly discuss this factor in discounting the subjective complaints. [7]

The Court therefore finds that the ALJ acknowledged Claimant's fibromyalgia and adequately considered her allegations of fibromyalgia-related symptoms. Substantial evidence supports their ultimate decision to discredit the severity of these symptoms, and the Court will not disturb the opinion.

### 3. Daily Activities[8]

Claimant finally attacks the ALJ's reliance on her daily activities as a "good reason" for assigning little weight to Ms. Albert's opinion and rationale for discounting her alleged symptoms.

---

[7] The Court also rejects Claimant's argument that the ALJ improperly relied on the tender points and pain to discount her fibromyalgia diagnosis and related symptoms since she mischaracterizes the ALJ's decision. (ECF No. 11, PageID #: 1358–59 (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247–49 (6th Cir. 2007); *Fairchild v. Kijakazi*, No: 3:20-cv-306, 2022 U.S. Dist. LEXIS 182057, at *8–9 (E.D. Tenn. Mar. 21, 2022))). The ALJ referred to these conditions to discount Ms. Albert's opinion, not Claimant's overall fibromyalgia symptoms. In fact, the ALJ did not reference these symptoms when they discounted Claimant's symptoms. Thus, this argument is unavailing.

[8] While the Court already addressed daily activities in its previous section, it also addresses the topic here out of an abundance of caution since Claimant brought this as an independent claim in her brief. (*See* ECF No. 11, PageID #: 1360–61).

(*Id.* at PageID #: 1360–61). She argues the ALJ "gross[ly] mischaracter[ized]" her abilities and explains why the activities do not support the RFC. (*Id.*). The Commissioner argues that the ALJ already considered the additional details Claimant references, and properly used them to discount Ms. Albert's opinion and Claimant's allegations of disabling symptoms. (ECF No. 13, PageID #: 1379).

The Court agrees with the Commissioner that the ALJ considered most of the additional details Claimant brings and that her argument constitutes an attempt to reweigh the evidence. While Claimant suggests that the activities are inconsistent with medium work, she fails to recognize that the ALJ adopted their RFC after careful analysis of the medical evidence, opinion evidence, and Claimants alleged symptoms. (*See* ECF No. 15, PageID #: 1396).[9] Even assuming the activities do not support medium work, they are simply one factor the ALJ reviewed when they assigned an RFC. Further, while Claimant focuses on a single sentence where the ALJ briefly referred to daily activities in discounting Ms. Albert's opinion, she disregards the extensive summary of Claimant's testimony and subjective complaints earlier in the RFC analysis. (*See* ECF No. 11, PageID #: 1361–62). There, the ALJ extensively described the nature of Claimant's daily activities with significant detail, accurately summarizing Claimant's abilities in their RFC analysis. (ECF No. 8, PageID #: 893–94). Substantial evidence supports the ALJ's interpretation of the activities, and the Court will not disturb the finding based on Claimant's argument.

## VI.     Conclusion

---

[9] Claimant also asserts in her reply brief that the ALJ did not build a logical bridge when evaluating her daily activities. (ECF No. 15, PageID #: 1396). However, this argument is waived for Claimant's failure to raise it in her initial brief. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held, however, that arguments made to us for the first time in a reply brief are waived.") (citing *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004)); *see also Braun v. Comm's of Soc. Sec.*, 2021 WL 8016061, at *12 (N.D. Ohio Apr. 7, 2021) ("It is well established that arguments made for the first time in a reply brief are waived.").

Based on the foregoing, the Court AFFIRMS the Commissioner of Social Security's nondisability finding.

Dated: August 25, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE